# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS SOBER HOUSING CORPORATION, Plaintiff )))))) v. )) CITY OF CHELSEA, JAY ASH, in his capacity as City Manager of the City of Chelsea, JOSEPH COONEY, in his capacity as Director of the Department of Inspectional Services of the City of Chelsea, and JOSEPH SIEWKO, in his capacity as Fire Chief of the City of Chelsea, Defendants ) | Civil Action No. |

MASSACHUSETTS SOBER HOUSING
CORPORATION,
          Plaintiff

v.

CITY OF CHELSEA, JAY ASH, in his capacity
as City Manager of the City of Chelsea,
JOSEPH COONEY, in his capacity as Director
of the Department of Inspectional Services of
the City of Chelsea, and JOSEPH SIEWKO,
in his capacity as Fire Chief of the City of
Chelsea,
          Defendants

Civil Action No.

04 CV 10753 JLT

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATON FOR PRELIMINARY INJUNCTION

The Massachusetts Sober Housing Corporation (MSHC) submits this Memorandum of Law in

support of its Application for Preliminary Injunction.

## PRELIMINARY INJUNCTION STANDARD

In order to gain a preliminary injunction in the First Circuit, a plaintiff

must satisfy four criteria. The court must find:  (1) that plaintiff will suffer irreparable

injury if the injunction is not granted; (2) that such injury outweighs any harm which

granting injunctive relief would inflict on the defendant; (3) that plaintiff has

exhibited a likelihood of success on the merits; and (4) that the public interest will

not be adversely affected by the granting of the injunction. *Suarez-Cestero v. Pagan-Rosa*,

172 F.3d 102, 104 (1st Cir. 1999) As the facts show in this case, plaintiff has met all of the

above criteria and the injunction should issue.

## BACKGROUND

### A.    Massachusetts Sober Housing Corporation

MSHC is a non-profit charitable corporation organized under Mass. Gen. L. c. 180,

with its principal place of business in Cambridge, Massachusetts.  Since its incorporation on

April 26, 2000, MSHC has endeavored to increase the availability of rental housing in

Massachusetts to those individuals who are recovering from alcoholism and drug addiction.

MSHC accomplishes this mission by purchasing houses in residential neighborhoods

throughout Massachusetts to create sober houses where either men or women in early recovery

can live together in a safe, affordable, peer supportive environment which allows them to

solidify their recovery and become self-sufficient.

The sober housing model which MSHC uses exclusively is called Oxford House, a

model created in 1975 in Maryland.  There are now over 1,000 Oxford Houses nationwide.

The first Oxford House in Massachusetts opened in Malden in May, 1989.  Oxford House is

based on three principles: 1) the house must be democratically operated; 2) the house must be

financially self-supporting; and 3) any resident who uses alcohol or drugs must be expelled

immediately.  Oxford Houses require a sufficient number of residents to create a peer group in

which residents provide support for fellow residents in recovery, share house expenses,

collectively decide all issues that arise in the house, and participate in the day-to-day upkeep of the house. Additionally, Oxford Houses require a large enough number of residents so that each resident's weekly house share of expenses, i.e. rent, utilities, cleaning supplies, etc., will generate sufficient monthly house income to pay rent to the landlord, in this case MSHC, and to cover house expenses. An *Oxford House Manual*, which guides the operation of each Oxford House, is attached as **ATTACHMENT A**.

MSHC purchased its first house in August, 2001 in Hyde Park (Boston), Massachusetts. The house opened on December 5, 2001 as a home for ten women in recovery. As in all Oxford Houses, as residents leave, prospective residents are interviewed and voted in by the house members to fill the vacancies. That house has remained fully occupied since opening and often maintains a waiting list. On October 10, 2002, MSHC purchased its second house at 105 South Street in New Bedford, which opened in January, 2003, as on Oxford House for ten men. On December 4, 2002, MSHC purchased its third house at 1532 Bay Street, Springfield, which opened in February 15, 2003, after extensive renovations, as an Oxford House for eight men. That house was opened in collaboration with the Hampden County Sheriff's Department and serves as a housing option for inmates released from a sober halfway house operated by the Sheriff's Department called "Honor Court." On July 23, 2003, MSHC purchased its fourth house at 1 Westwood Road, Plymouth, which opened in September, 2003 as an Oxford House for ten men. And on October 10, 2003, MSHC purchased its fifth house at 68 Hooper Street, Chelsea, which will be an Oxford House for ten male veterans and will be known as Oxford House-Hooper Street. This house is a collaborative effort with the New England Shelter for Homeless Veterans in Boston where many of the residents will come from. MSHC maintains a website, www.soberhousing.com,

3

to explain the work of the corporation, solicit financial and other support, and provide
information about our houses to prospective residents and the general public.

### B.    68 Hooper Street, Chelsea

MSHC and New England Shelter for Homeless Veterans, 17 Court Street, Boston, MA
began discussions in the summer of 2002 regarding the possibility of establishing an Oxford
House for veterans who were residents of the shelter.  Those discussions resulted in a
collaborative agreement and the submission of grant applications to the Center for Community
Recovery Innovations, Inc. (CCRI), a non-profit foundation within the Massachusetts Housing
Finance Agency (MHFA); and to the U.S. Department of Housing and Urban Development
(HUD) under their Supportive Housing Program.  A $75,000 grant was awarded by CCRI,
and a $200,000 grant was awarded by HUD, for the purchase and renovation of a house in
Chelsea, MA to become an Oxford House for ten veterans in recovery.[1]  After an extensive
search for an appropriate property during the spring and summer of 2003, a property was
located at 68 Hooper Street, Chelsea ("the property").  An offer was made on the property
which was accepted, financing was obtained with a local bank for the balance of the purchase
and renovation costs not covered by the two grants, and the property was conveyed to MSHC
on October 10, 2003.

Within a week of purchasing the property, the general contractor who was hired to
oversee the renovation of the property, Myles J. Curran, submitted an application for a
building permit to the Department of Inspectional Services of the City of Chelsea.  When no
decision was received on said application by the end of October, the president of MSHC,

---

[1] A $75,000 grant from CCRI and a $200,000 HUD Supportive Housing Program grant were also awarded for the
purchase of the 1 Westwood Road, Plymouth, property.

Bruce T. Macdonald, telephoned the Director of the Department of Inspectional Services,

Joseph Cooney, in early November to inquire as to status of the building permit. When no

return telephone call was received by November 5, Macdonald sent a letter to Cooney,

**EXHIBIT B**[2], in which he stated that Cooney's lack of response was taken as a denial of the

building permit based on Cooney's earlier expressed concern that the Oxford House that was

proposed was a boarding house and, therefore, did not comply with the zoning classification of

the neighborhood. Macdonald reiterated his previous offer to meet with city officials "to

explain the Oxford House sober housing model which MSHC uses exclusively, and how the

residents of this house are protected by the Fair Housing Act and other statutes." *Id.* The

letter also requested that the City "make a reasonable accommodation in rules, policies,

practices, or services, [under the Fair Housing Act] because such accommodations may be

necessary to afford the prospective residents of 68 Hooper Street equal opportunity to use and

enjoy that dwelling." *Id.*

On November 18, 2003, a meeting was held between MSHC and City of Chelsea

representatives at Chelsea City Hall. Present at the meeting were: Jay Ash, City Manager;

Frank Garvin, Police Chief; Cheryl Anne Watson, Corporate Counsel; the City veterans agent;

and MSHC president Bruce Macdonald. Macdonald explained the Oxford House model and,

in particular, the importance of Oxford Houses being treated as single family houses rather

than lodging or rooming houses, and the protections granted to the residents of the house as

disabled persons under the federal Fair Housing Act. Macdonald asked that the City grant a

reasonable accommodation to allow ten veterans in recovery to reside at 68 Hooper Street as a

single family house. After initially expressing concern that MSHC had not informed the city

---

[2] Exhibits which are cited are attached to the Verified Complaint.

5

of their intention before they purchased the property, Ash expressed a willingness to work together with MSHC to create this Oxford House for veterans and the meeting ended with an agreement that Macdonald would continue discussions with Atty. Watson with a view toward executing some sort of written memorandum between MSHC and the City. After numerous telephone conferences and faxes between Atty. Watson and Macdonald, a Memorandum of Understanding was agreed to and signed by Ash, Macdonald and Atty. Watson as of December 9, 2003. **(EXHIBIT C)**. Upon request by Macdonald to Atty. Watson for confirmation that the Oxford House would comply with Chelsea Zoning Regulations as a single family house, Atty. Watson provided a letter confirming that "with a reasonable accommodation"... the property "complies with the City of Chelsea's Zoning Regulations." **(EXHIBIT D)** The Building Permit was finally issued on December 16, 2003, although the notation at the bottom of the permit "Issued Under Federal Housing Act" indicates that it was issued grudgingly. **(EXHIBIT E)**

In spite of the City's agreement to treat the Oxford House as a single family house in the meeting on November 18, in the Memorandum of Understanding dated December 9, and in the letter above-referred to dated December 15, Inspectional Services Director Cooney reneged on the City's agreement by requiring in a letter dated December 18, 2003 **(EXHIBIT F)** that the property have an automatic sprinkler system as purportedly required by: 1) G.L. c. 148, § 26H; and 2) Sec. 904.7 of the State Building Code. By letter dated January 8, 2004 **(EXHIBIT G)** the City professed to abandon reliance on the State Building Code and to rely only on G.L. c. 148, § 26H. The City continues to refuse to issue the Certificate of Occupancy, relying on G.L. c. 148, § 26H. (See letter dated April 7, 2004, attached as **EXHIBIT K**). Nine veterans have been accepted as residents in Oxford House-Hooper Street

6

and are waiting to move from the New England Shelter for Homeless Veterans to the house as soon as the Certificate of Occupancy is issued.  (See Affidavit of Diane C. Gilbert, **EXHIBIT L**).

## ARGUMENT

### A.    68 Hooper Street is Not a Lodging House

In spite of agreements reached at the meeting at City Hall on November 18, 2003, and in spite of the Memorandum of Understanding which the City entered into on December 9, 2003, the City maintains that the use of 68 Hooper Street as an Oxford House for ten veterans in recovery from alcoholism and drug addiction will be a lodging house.  Having apparently abandoned any reliance on the State Building Code, the City's sole argument is that the following language in the second paragraph of G.L. c. 148, § 26H requires the property to be treated as a lodging house:

> For the purpose of this section "lodging house" or "boarding house" shall mean a house where lodgings are let to six or more persons not within the second degree of kindred to the person conducting it, but shall not include fraternity houses or dormitories, rest homes or group residences licensed or regulated by agencies of the commonwealth.

This definition of lodging house in § 26H is clearly not a fire safety rule, but it is rather what is referred to as a family composition rule, which is a rule designed to preserve the family character of a neighborhood based on the composition of a household rather than the total number of occupants living quarters can contain.  *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 732-733 (1995).  If § 26H were a fire safety rule then the fire protection

afforded by an automatic sprinkler system would be afforded to everyone, not just to unrelated individuals.

The statutory definition of lodging house in § 26H contains three elements: (1) "a house where lodgings are let" (2) "to six or more persons" (3) "not within the second degree of kindred to the person conducting it." With the exception of the number "six" this definition is identical to the one contained in the Lodging House Statute, G.L. c. 140, § 22, *et seq.*[3]

A most thorough legal and historical analysis of the term "lodging house" is contained in the case of *Sangvo v. City of Boston*, (U.S. District Court, D.Mass., September 22, 2003, No. 01-11338-RWZ). (Attached as **ATTACHMENT B**). History and logic show that "lodgings" means "a room or rooms rented in a house or apartment in which someone else is the primary occupant and/or possessor of the property." *Id.* at 16, noting that the Supreme Judicial Court recognized this distinct concept of lodgings when they said: "[A] mere lodger in a house of another is not a tenant....[A] man who let rooms to lodgers [is] still the sole occupier of the house..." *White v. Maynard*, 111 Mass. 250, 253 (1872). "In an ordinary agreement for board and lodging in [a] boarding-house,...the...keeper of the boarding house [ ] retained the legal possession, custody and care of the whole house and every room therein." *Id.* at 255.

As Judge Zobel observed in *Sangvo*, unlike a lodging, "[a]n apartment leased by a tenant is not merely a set of rooms in 'the house of another'; tenants live in apartments as if they are the tenants' own homes for the term of the lease." At 15-16. That is exactly the description of an Oxford House. In the instant case, Oxford House-Hooper Street, which is the entire group of ten veterans, will enter into a two year renewable lease <u>for the entire house,</u>

8

signed by the house president.  It is collectively <u>their</u> house and, more importantly, <u>their home</u>. Lodgings are not being let to individual tenants as occurs in a lodging house.  The residents have the entire use of the common areas of the house.  They are responsible, collectively, for the upkeep and cleanliness of the house and yard.  They, collectively, pay for all house utilities and house supplies from a house checking account which is maintained by the house treasurer and comptroller (see **EXHIBIT A**).  Oxford House-Hooper Street bears no resemblance to a lodging house as that term has been defined and understood in Massachusetts for over a century.  As Judge Zobel observed: "A lodger still lets a room in another's house, while a tenant in an apartment (or house in this case) is king of his castle." *Id.* at 19.

It is apparent why the City abandoned their initial reliance on the State Building Code as a basis for requiring an automatic sprinkler system.  68 Hooper Street is properly classified as Use Group R-3 under the State Building Code:

> ***780 CMR 310.5*** **Use Group R-3 structures:**
>
> This use group shall include all buildings arranged for occupancy as *one-or two-family dwellings,* including *multiple single family dwellings* where each unit has two independent means *of egress* not common to any other *dwelling unit,* and where each *dwelling unit* is separated from adjoining dwelling units by two-hour *fire separation* assemblies (see 780 CMR 709.0) Use group R-3 structures are not *lodging houses* (see M.G.L.c. 140, § 22).  (Italics in original)

Director Cooney initially erroneously classified 68 Hooper Street as Use Group R-2 in his letter of December 18 (**EXHIBIT F**).  Use Group R-2 does not describe this property:

> ***780 CMR 310.4*** **Use Group R-2 structures:**

---

[3] G.L. c. 140, § 22: " 'Lodging house', as used in sections twenty-two to thirty-one, inclusive, shall mean a house where lodgings are let to four or more persons not within the second degree of kindred to the person conducting it…"

> This use group shall include all *multiple dwellings* having more than
> two *dwelling units,* except as provided for in 780 CMR 310.5 for
> multiple single *dwelling units,* and shall also include all *boarding
> houses* and similar buildings arranged for shelter and sleeping
> accommodations in which the occupants are primarily not transient in
> nature.

Other provisions of the Code of Massachusetts Regulations clearly distinguish lodging houses

and apartments from single family houses.  Under the State Sanitary Code, for example, a

"rooming house" – a designation that includes lodging houses – "contains...rooming units in

which space is let or sublet for compensation...to four or more persons not within the second

degree of kindred to the person compensated." 105 CMR § 410.020.  The Code proceeds to

define "rooming unit" as a "room or group of rooms let to an individual or household for use

as living and sleeping quarters but not for cooking, whether or not common facilities for

cooking are made available." *Id.*  By contrast, the Code also defines "dwelling unit": a "room

or group of rooms within a dwelling used...by one family or household for living, sleeping,

cooking and eating.  Dwelling unit shall also mean a condominium unit." Separate standards

are then promulgated for dwelling units and rooming houses.  See, e.g. 105 CMR §§ 410.100,

410.150, 410.550.  "This regulatory scheme, which is repeated and reinforced in other state

regulations, bolsters the plain meaning of the Lodging House Statute: a rooming unit is not a

dwelling unit, which is to say, an apartment is not synonymous with 'lodgings.'" *Sangvo v.
City of Boston,* supra, at 16-17.

The State Fire Code defines a lodging house as a building "in which separate sleeping

rooms are rented providing sleeping accommodations for persons on either a transient or a

permanent basis."  An apartment house, by contrast, contains "six or more dwelling units,"

which are defined as "single living unit[s]...providing complete independent living

10

facilities...including permanent provisions for living, sleeping, cooking and sanitation." 527 CMR § 24.03. See also 105 CMR § 460.020 (lead poisoning regulations, definition of rooming house).

Judge Zobel reviews the history of lodging houses in *Sangvo v. City of Boston,* supra, which supports the distinction between lodging houses and apartments (or single family houses):

> The distinction between lodgings and apartments is also supported
> by history. When the Lodging House Statute was first enacted, it
> was understood that lodging houses were different from apartment
> houses. Apartments were family houses "rented in suites and . . .
> fitted for housekeeping." Wolfe[4], supra, at 5. Lodging houses, by
> contrast, were not homes for families — they provided single sleeping
> accommodations, and lodgers ate their meals elsewhere. The two
> most common forms of lodging houses in Boston were Bowery-style
> dormitories for poor transients and the rooming houses that sheltered
> the city's "great army of mercantile employees and skilled mechanics
> -the clerks, salesmen, bookkeepers, stenographers, dressmakers,
> milliners, barbers, restaurant-keepers, policemen, nurses, and the
> unmarried journeymen carpenters, painters, machinists, electricians,
> etc." Id. at 5-6. The Lodging House Statute was broadly worded
> enough to encompass both types of accommodations. Because the
> statute also plainly extended to similar rooming arrangements such
> as nursing homes, see *Maher v. Brookline*, 339 Mass. 209 (1959),
> the statute was amended in 1960, 1965 and 1973 either to include
> or exclude various living situations analogous to "lodgings."
> Nothing in those amendments shows any legislative intention to
> extend the traditional notion of lodgings to apartments. The history
> of lodging houses in Boston and the legislative history of the
> Lodging House Statute support the plain language distinction
> between lodgings and apartments.

*Sangvo v. City of Boston,* supra, at 17-18.

The City of Chelsea has simply used G.L. c. 148, § 26H as a pretext to deny these ten veterans the safe, affordable sober housing they seek. The City is discriminating against them

because of their disability, see Argument B. *post*. Logic, common sense, history, and legal precedent all describe Oxford House-Hooper Street as a single family house, not a lodging house.

**B.    The City is Violating the Fair Housing Act**

The Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, (FHA) was amended by the Fair Housing Amendments Act (FHAA) in 1988 to prohibit discrimination on the basis of handicap. Under § 3604(f)(1), it is unlawful:

> To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of –
>
> (A)    that buyer or renter,
>
> (B)    a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or
>
> (C)    any person associated with that buyer or renter.

> As amended, the Act defines "handicap" as follows:
>
> (1)    a physical or mental impairment which substantially limits one or more of such person's major life activities;
>
> (2)    a record of having such an impairment, or
>
> (3)    being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance.

42 U.S.C. § 3602(h).

It is clear that Congress contemplated alcoholism and drug addiction as being the kinds of "impairments" covered under this definition. The legislative history of the 1988

---

[4] Albert Benedict Wolfe, The Lodging House Problem in Boston (1906)

amendments,[5] as well as the regulations promulgated by the Department of Housing and Urban Development pursuant to the Act,[6] clearly support this interpretation. *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 459 (D.N.J. 1992); *Oxford House, Inc. v. City of Albany*, 819 F.Supp. 1168, 1175 (N.D.N.Y. 1993); *United States v. Southern Management Corp.*, 955 F.2d 914 (4th Cir. 1992).

The FHAA clearly applies to local zoning ordinances that discriminate against the handicapped in obtaining housing. See 42 U.S.C. § 3615 (providing that "any law of a State, a political subdivision, or other jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall be to that extent invalid.").

The legislative history of the FHAA specifically addresses application of the Fair Housing Act to zoning ordinances. According to the House Report:

> [The FHAA provisions on handicapped discrimination] also apply to state or local land use ...laws, regulations, practices or decisions which discriminate against individuals with handicaps. While state and local government have authority to protect safety and health and to regulate the use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of...land use requirements on congregate living arrangements among non-related persons with disabilities. Since these

---

[5] The House report states:

[I]ndividuals who have a record of drug use or addiction but who are not currently using illegal drugs would continue to be protected if they fell under the definition of handicap...Just like any other person with a disability, such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.
H.R.Rep. No. 711, 100th Cong., 2d Sess. 22 (1988), *reprinted in* 1988 U.S. Code Cong. & Admin. News 2173, 2183 ("House Report")

[6] The regulations state that:

The term physical or mental impairment includes, but is not limited to, such diseases and conditions as...drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism. 24 CFR § 100.201(a)(2).

requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against people with disabilities.

The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community...

Another method of making housing unavailable to people with disabilities has been the application or enforcement of neutral rules and regulations on...land use in a manner which discriminates against people with disabilities.

H.R. Rep. No. 711, 100th Cong., 2d Sess. 24 (1988), *reprinted in* 1988 U.S. Code Cong. & Admin. News. 2173, 2185 ("House Report").

Many courts considering the applicability of the FHAA to Oxford Houses have recognized the importance of recovering substance abusers living in large enough numbers to support each other and prevent relapse. One U.S. District Court observed:

Addiction to illegal drugs or alcohol places severe limitations on people's lives, disrupting personal relationships, and impairing one's ability to advance in school or employment. These limitations continue to have a significant impact on an alcoholic's or drug addict's life even after the process of recovery has begun. After completion of a rehabilitation program, it is crucial for recovering alcoholics and substance abusers to have a supportive, drug and alcohol-free living environment. The support obtained by being in a group of other recovering addicts substantially increases an individual's chances for recovery.

*Township of Cherry Hill*, supra, 799 F.Supp. at 456. Another recognized that "[r]ecovering alcoholics or drug addicts require a group living arrangement in a residential neighborhood for psychological and emotional support during the recovery process." *Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1183 (E.D.N.Y. 1993).

MSHC can establish a violation of the Fair Housing Act by showing any one of the following: 1) that the City intentionally discriminated against the handicapped; 2) that the City's actions had a disparate impact on the handicapped; or 3) that the City refused to make a reasonable accommodation.

### a.    The City's Decision Was Motivated by Discriminatory Intent

To establish a prima facie case of discriminatory intent, MSHC need not show that the City's decision to prohibit a ten man veterans Oxford House "rested solely" on discrimination against substance abusers. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977). It is sufficient that a discriminatory purpose was a "motivating factor" in the decision. Id. at 266. "A plaintiff makes out a prima facie case of intentional discrimination under the FHAA merely by showing that a protected group has been subjected to explicitly differential – i.e. discriminatory – treatment." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (1995). See also *Casa Marie*, supra, 988 F.2d at 269; *Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Com'n*, 790 F.Supp. 1197, 1211 (D.Conn. 1992); *A.F.A.P.S. v. A.R.P.E.*, 740 F.Supp. 95, 103 (D.Puerto Rico 1990). Relevant factors include: 1) the impact of the action; 2) the historical background of the decision; 3) the specific sequence of events leading up to the challenged decision; 4) departures from the normal procedural sequence; and 5) the legislative and administrative history of the action. *Village of Arlington Heights,* supra, 429 U.S. at 264-268.

In this case the City reneged on an agreement to treat the house as a single family house after a meeting at City Hall at which the City Manager, Jay Ash, expressed his unhappiness that MSHC had not consulted city officials first before the house was purchased, as any halfway house, treatment facility or drug rehabilitation facility would have done, and he also

15

expressed concern about the type of individuals who would be living in the house, especially in regard to sex offenders, indicating that neighbors had raised these concerns. Ash was quoted in the Boston Globe: "The way [MSHC] approached this is the worst community relations that I've seen in years." Brian McGrory, "A Heritage Forgotten," Boston Globe, March 26, 2004, p. B1. (**ATTACHMENT** C) A single family buying a house and moving into Chelsea, of course, would not need to mount any "community relations" effort. Courts have inferred discriminatory intent when circumstances indicate that city officials bowed to community prejudices against the disabled. As the District of Puerto Rico commented:

> [A] decision maker has a duty not to allow illegal prejudices of the majority to influence the decision making process... [I]f an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decision maker personally has no strong views on the matter.

*A.F.A.P.S.*, supra, 740 F.Supp. at 104 (granting permanent injunction to group home for AIDS patients); see also *Horizon House Developmental Services, Inc.*, supra, 804 F.Supp. at 695-97 (granting permanent injunction to group home for mentally retarded); *Easter Seal Society of New Jersey v. Township of North Bergen*, 798 F.Supp. 228, 233-37 (granting preliminary injunction to group home for developmentally disabled, and finding mayor's comments "particularly relevant"); *United States v. Borough of Audubon,* 797 F.Supp. 353, 360-62 (D.N.J. 1991) (granting permanent injunction to home for recovering substance abusers and imposing civil penalty on Borough); *Stewart B. McKinney Foundation, Inc.*, supra, 790 F.Supp. at 1211-16 (granting preliminary injunction to group home for AIDS patients); *City of Plainfield*, supra, 769 F.Supp. at 1343 (granting preliminary injunction).

**b.**    **The Statute Has a Disparate Impact on Recovering Substance Abusers**

To establish a prima facie case under disparate impact analysis, MSHC must prove that the City's reliance on G.L. c. 148, § 26H "actually or predictably" results either in discrimination or in a "disproportionate burden" on recovering substance abusers. *Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 269, n. 20 (1st Cir. 1993) Although direct proof of discriminatory intent is not essential, MSHC can "bolster" the evidence of discriminatory effect "by introducing direct evidence, such as statements made by the defendant, that the defendant acted out of discriminatory animus." Id. Once MSHC has established its prima facie case, the burden shifts to the City "to advance some legitimate and non-discriminatory reason for [its] actions." Id. The Court then must weigh the evidence of discriminatory effect or intent against the proffered justifications. Id. See also *Town of Babylon*, supra, 819 F.Supp. at 1182-83; *Horizon House Developmental Services, Inc.*, supra, 804 F.Supp. at 697.

The First Circuit has ruled that courts should consider the type of relief sought by the plaintiff in conducting the balancing process:

> Where plaintiff seeks a judgment which would require defendant to take affirmative action to correct a Title VIII violation, plaintiff must make a greater showing of discriminatory effect. On the other hand, if plaintiff seeks a judgment merely enjoining defendant from further interference with the exercise of plaintiff's Title VIII rights, a lesser showing of discriminatory effect would suffice.

*Casa Marie*, supra, 988 F.2d at 269, n. 20. See also *Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 936 (2d Cir. 1988) (if plaintiff is suing "to compel a governmental defendant to build housing," rather than "to eliminate some obstacle to housing," defendant

must establish a "somewhat more substantial justification"); *Town of Babylon,* supra, 819 F.Supp. at 1185 (same).

In this case, the lodging house classification system in G.L. c. 148, § 26H, as construed by the City, clearly violates the FHAA. Penalizing larger numbers of unrelated individuals living together in an Oxford House has a disparate impact on recovering substance abusers because these individuals "require a group living arrangement in a residential neighborhood for psychological and emotional support during the recovery process." *Town of Babylon,* supra, 819 F.Supp. at 1183-84; *Township of Cherry Hill,* supra, 799 F.Supp. at 461-62 (granting preliminary injunction); *Oxford House-Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1344 (D.N.J. 1991) (same).

Moreover, the City's action in classifying 68 Hooper Street as a lodging house for purposes of § 26H, is especially egregious when the house in question is clearly a single family house and has been classified as a single family house for zoning purposes by the City. (See **EXHIBITS C, D**).

    c.    <u>The City Has Refused to Make a Reasonable Accommodation</u>

Courts have unanimously applied the reasonable accommodations requirement to zoning ordinances and other land use regulations and practices. *Tsombanidis v. City of West Haven,* 180 F.Supp.2d 262 (D.Conn. 2001), aff'd in part, rev'd in part, 353 F3d 565 (2nd Cir. 2003); *Township of Cherry Hill,* supra, 799 F.Supp. at 462-63; *Horizon House Developmental Services, Inc.,* supra, 804 F.Supp. at 699-700; *Stewart B. McKinney Foundation, Inc.,* supra, 790 F.Supp. at 1221; *United States v. Village of Marshall,* 787

F.Supp. 872, 878 (W.D.Wis. 1991); *United States v. Commonwealth of Puerto Rico*, 764 F.Supp. 220, 224 (D.P.R. 1991).

The FHAA explicitly requires that municipalities and other governmental entities make "reasonable accommodations" in their rules, practices, or services "when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).  Courts have "unanimously applied the [FHAA's] reasonable accommodation requirement to zoning ordinances and other land use regulations and practices." *Town of Babylon,* supra, 819 F.Supp. at 1185.  "Federal courts have consistently found under the FHA an accommodation reasonable when it imposes no undue financial or administrative hardships on the defendant making the accommodation and when it does not undermine the basic purpose of the requirement." *Proviso Association of Retarded Citizens v. Village of Westchester*, 914 F.Supp. 1555, 1562 (N.D. Ill. 1996) (city required to waive sprinkler system requirement as a reasonable accommodation)

Even though it did not concede that G.L. c. 148, § 26H required the installation of an automatic sprinkler system at 68 Hooper Street, MSHC requested a reasonable accommodation by letter dated January 27, 2004 (**EXHIBIT J**) in the form of a waiver of any perceived automatic sprinkler system requirement.  The City never responded to that request.  The City has presented no evidence that it will suffer any hardship if it waives the perceived sprinkler requirement.  The City would be hard pressed to present evidence that a reasonable accommodation would increase risk to its citizens inasmuch as there is no requirement that single family houses in Chelsea be equipped with automatic sprinkler systems.

The accommodation requested by MSHC was entirely reasonable – to allow ten men to reside at 68 Hooper Street, a single family house, without the necessity of an automatic

sprinkler system which, it is safe to say, no other single family house in Chelsea was required to install. This requested accommodation "would impose no financial or administrative burden" on the City and is clearly reasonable. *United States v. City of Philadelphia*, 838 F.Supp. 223, 228 (E.D.Pa. 1993); see also *United States v. Com. of Puerto Rico*, supra, 764 F.Supp. at 224.

In a case with striking similarities, a municipality refused to issue a certificate of occupancy to a group home for mentally ill adults on the grounds that the home required a sprinkler system. In addition to finding that the city had intentionally discriminated against these handicapped individuals in violation of the FHAA, the court held that the city's refusal to grant a reasonable accommodation was also a violation of the FHAA. *Alliance for Mentally Ill v. City of Naperville*, 923 F.Supp. 1057 (N.D.Ill. 1996). The court held that waiving the sprinkler requirement would allow additional mentally ill adults to live in the home, thus helping their reintegration into the community. Additionally, "the accommodation requested amounts to nothing more than a request for non-enforcement of a rule, and Naperville 'has not articulated any hardship (administrative or financial) resulting from non-enforcement.'" *Id.* at 1078.

## C.    Criteria for Issuance of a Preliminary Injunction Have Been Satisfied

It is clear that plaintiff, and more particularly the prospective residents of Oxford House-Hooper Street, will suffer irreparable injury if the injunction is not granted. *Stewart B. McKinney Foundation, Inc. v. Town Plan & Zoning Comm.*, 790 F.Supp. 1197, 1209 (D.Conn. 1992) ("Monetary damages would not adequately compensate the plaintiff for its inability to achieve its purpose of providing housing in the Oldfield property to needy HIV-infected persons pending a final determination of this action. Therefore, the

20

plaintiff would suffer irreparable harm if a preliminary injunction did not issue."); *Oxford House-Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1343 (D.N.J. 1991) (on motion for preliminary injunction: city's enforcement of zoning ordinance so as to prevent operation of local Oxford House in area zoned for single-family residences violated FHAA). The City will suffer no corresponding harm if the injunction is granted.

It is submitted that plaintiff has exhibited a strong likelihood of success on the merits and there is absolutely no evidence or reason to believe that the public interest will be adversely affected by the granting of the injunction. To the contrary, the public's interest in obtaining housing for homeless veterans will be advanced.

## CONCLUSION

Because Oxford House-Hooper Street is not a lodging house as that term is defined in G.L. c. 148, § 26H, no automatic sprinkler system should be required under that statute. The City of Chelsea has violated the Fair Housing Act by requiring the installation of an automatic sprinkler system and, in so doing, has committed discrimination against disabled individuals protected by that Act. Additionally, the City has refused to grant a reasonable accommodation waiving any perceived sprinkler requirement, in further violation of the Act.

For the foregoing reasons, plaintiff requests that a preliminary injunction issue against all defendants requiring them to issue the Certificate of Occupancy forthwith and prohibiting them from interfering with the use and enjoyment of 68 Hooper Street by ten veterans in recovery from alcoholism and/or drug addiction as an Oxford House.

Dated: April 13, 2004

Respectfully submitted,

MASSACHUSETTS SOBER
HOUSING CORPORATION

By its attorney,

Bruce T. Macdonald
678 Massachusetts Avenue
Suite 901
Cambridge, MA 02139
(617) 354-1711